**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**FILED**

May 24 2023

**CLERK, U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
BY          s/ dmartinez          DEPUTY

RICHARD ARJUN KAUL, MD

Propria Persona Plaintiff

v.

UC SAN DIEGO PACE PROGRAM
ALBERT Y. LEUNG, MD

CASE NO:  '23CV0955 RBM DEB

COMPLAINT FOR DAMAGES

DEMAND FOR JURY TRIAL

RICHARD ARJUN KAUL, MD
PROPRIA PERSONA PLAINTIFF
24 WASHINGTON VALLEY ROAD
MORRISTOWN, NJ 07960
973 876 2877
drrichardkaul@gmail.com

1

## PRELIMINARY STATEMENT

1. This case pertains to the perpetration by Defendants Albert Leung ("**Leung**") and UC San Diego PACE Program ("**PACE**"), the latter a for-profit corporation operating under the auspices of the UCSD School of Medicine, of a knowingly fraudulent scheme ("**PACE Scheme**") that egregiously violated, and continues to violate the human/constitutional rights of Plaintiff, Richard Arjun Kaul ("**Kaul**").

2. The Defendants perpetrated this offense by the issuance on October 17, 2022, of a knowingly fraudulent physician assessment report, related to Kaul's application and May 27, 2020, grant of a medical license in the State of Pennsylvania.

3. The Defendants motivation was profit and the maintenance of favorable commercial relations with one of its largest referral sources, the Federation of State Medical Boards ("**FSMB**") a for profit corporation, of which all state medical boards are members, and a corporation that controls the multi-billion-dollar business of physician licensing, disciplining and continuing education.

4. Kaul commenced suit in the United States District Court against the FSMB in 2019 on anti-trust/racketeering/civil rights charges, and thus levied a threat against the commercial interests of the Defendants, who responded by issuing a knowingly false legal instrument.

5. Similarly, Defendant PACE is motivated to fail applicants, as it provides a basis on which to entangle physicians in an endless series of extremely expensive, and

fraudulently based continuing education courses, from which Defendant PACE continues to profit.

6. This case includes highly incriminating audio evidence, that only emerged in this case because the initial part of the assessment was conducted virtually, due to COVID restrictions. Prior to the pandemic, the entire assessment was performed on-site, and the only retained record was that in the possession of Defendant PACE, a record that they would routinely refuse to provide to physicians. In fact, in this case, Kaul's multiple requests to be provided a copy of the record of the second, on-site part of the assessment course, have either been ignored or addressed with further knowingly fraudulent statements of obfuscation. The other reason as to why previously aggrieved physicians did not seek recompense, was their lack of funds to initiate litigation and or their ability to commence suit without counsel.

7. The method employed by the Defendants in the perpetration of the **"PACE Scheme",** involved the commission of knowingly fraudulent acts, through and under the cover of an agency of the State of California, that of UCSD School of Medicine. Defendant PACE's misconduct in this case represents a continuation of its prior **"pattern"**, in which it has disproportionately targeted physicians from ethnic minorities and foreign medical graduates. Kaul is a citizen of India and graduated from the University of London.

8. This case seeks compensatory/punitive/consequential damages, and endeavors to expose for the purposes of rectification, a serious and concerted, profit-purposed violation of human/constitutional rights of physicians and abuse of

power, that further decimates the lives of physicians, their families, and their patient populations.

# PARTIES

9. **Plaintiff:**

Richard Arjun Kaul — 440c Somerset Drive, Pearl River, NY 10965/973 876 2877
drrichardkaul@gmail.com
CV enclosed (**EXHIBIT 1**).

10. **Defendants:**

UC San Diego Physician Assessment and Clinical Education (PACE) Program — 220
West Arbor Drive #8204, San Diego, CA 92103-8204/619 543
6770/ucpace@ucsd.edu

Dr. Albert Y. Leung — 9300 Campus Point Drive, La Jolla, CA 92037/858 657 7000

# VENUE/JURISDICTION

11. **Jurisdiction:**

General:
28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Kaul's Constitutional rights.

U.S.C. § 337 – Plaintiff's allegations allege violations of an Act of Congress regulating commerce and monopolies.

28 U.S.C. § 1332(d)(2)(A) – Plaintiff is a citizen of a different state to certain Defendants and the aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000).

12. Personal:
The Court has personal jurisdiction over all Defendants, as each Defendant has transacted business, maintained substantial contacts, and/or committed acts in furtherance of the illegal **"PACE Scheme"** and conspiracy throughout the United States, including in this district. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in California.

13. **Venue:**

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## STATEMENT OF FACT

14. The facts underpinning this case, have their origins and are related to a **"pattern"** of fact generation that commenced in or around 2005/2006, as part of a conspiracy initiated by a group of New Jersey neurosurgeons/interventional pain physicians, who sought, in an anti-competitive manner, to have Kaul eliminated from the minimally invasive spine surgery market, after he had invented and successfully performed the first outpatient minimally invasive spinal fusion in February/March 2005:
https://www.youtube.com/watch?v=q_HBzqfggrg&t=343s

15. Kaul's procedure revolutionized the field of minimally invasive spine surgery, by proving that spinal fusions could be safely performed on a same-day basis in an outpatient surgical center, by a physician with training in interventional pain/minimally invasive spine surgery.

16. The New Jersey neurosurgeons/interventional pain physicians schemed unsuccessfully for several years to stymie the growth of Kaul's practice, by slandering him to patients/physicians, threatening to withdraw their business from medical device companies that also supplied Kaul and obstructing Kaul's applications for hospital privileges in New Jersey.

17. Recognizing the failure of these tactics, these individuals and others then bribed the then New Jersey Governor, Christopher J. Christie, in a series of quid pro quo schemes, in which they funneled monies into his political campaigns, in

return for him using his executive power to order the New Jersey Medical Board to manufacture a sham proceeding/false case to revoke Kaul's New Jersey license.

18. The premise of the case was that Kaul was allegedly not qualified/credentialed to perform minimally invasive spine surgery, a knowingly false premise, contradicted by the facts that Kaul had been credentialled to perform minimally invasive spine surgery by Medicare, the American Association of Ambulatory Healthcare (AAAHC) and the State of New Jersey, pursuant to his license to practice medicine and surgery, a license issued in 1996.

19. In this vein of violation and fraud, the State of New Jersey also knew that Kaul had, from 2004 to 2012, successfully performed eight hundred (800) minimally invasive spinal fusions with good to very good outcomes in 90-95% of cases (average is 65-70%) with a complication rate of 0.1% (average is 5-15%); and had been credentialed by six (6) state licensed surgical centers to perform such procedures.

20. Although these facts and others were submitted during the legal proceedings, the outcome was a forgone conclusion, and was a direct consequence of the perpetration of a **"pattern of racketeering"** that converted the State of New Jersey into a **"racketeering enterprise"**, the purpose of which was to advance the economic/political agendas of the conspirators.

21. Kaul's license was revoked on March 24, 2014, after a series of legal proceedings in which it subsequently emerged that there had been, amongst

other things, evidence falsification/witness tampering/perjury/corruption of administrative judicial officers.

22. Having lost everything, except his life, Kaul entered a state of poverty, and taught himself the law, and on February 22, 2016, commenced litigation in the United States District Court, in what would be the first in a series of lawsuits (**The Kaul Cases**) against the individuals/entities that caused injury to himself and his children.

23. However, Kaul's efforts to present his evidence (**EXHIBIT 2**) to a jury in America have remained unsuccessful, and so on April 23, 2022, Kaul, through counsel, filed suit in India against the State of New Jersey/Allstate Insurance Company/Christopher J. Christie, an excerpt of which is enclosed (**EXHIBIT 3**). The Indian court is advancing the case, with the next court date scheduled for December 15, 2022. Another Indian American physician, based in Louisiana and subjected to the same tactics as Kaul, is in the process of filing suit in India, having been unable to access even the process of justice in America, let alone justice.

24. While Kaul was attempting to secure justice in the American courts, he applied for licensure in the State of Pennsylvania, and after a one-day hearing on February 7, 2020, his application was granted on May 27, 2020, contingent on the completion of a physician assessment course. However, due to his condition of poverty he did not have the monies to fund such a course, but was eventually able to persuade friends to pay the course fee of approximately $20,000, and provide monies for Kaul's flight/accommodation to and in San Diego.

25. The Defendants wrongdoing is the proximate cause of Kaul's continued state of poverty, as had the Defendants not issued a fraudulent report, Kaul would now be in possession of a PA license, and would be practicing medicine and earning a livelihood. The Defendants misconduct constitutes an **"ongoing pattern of racketeering"**, a **"pattern"** that commenced in 2005/2006.

26. With this context in mind, the relevant facts of chronology and those of the fraud committed by the Defendants are substantiated within the submitted evidence:

27. <u>April 12-15, 2022 – Email exchange between PACE and Kaul re: enrollment</u>: Within this exchange, Kaul received and sent multiple documents, which included a TERMS AND CONDITIONS FOR PARTICIPATION IN UCSD PHYSICIAN ASSESSMENT AND CLINICAL EDUCATION (PACE) PROGRAM and a Root Cause Analysis: April 14, 2022, submitted by Kaul (**EXHIBIT 4**). On Page 1 of 2 of the former, there is a section for participants that self-referred, as did Kaul, and in this section, it states: **"... I understand and agree that PACE will disclose results of my activity in the Program only to parties authorized by me or as required by law or duly authorized regulatory agency."** When Kaul attended the second on-site component of the course on July 22, 2022, he confirmed with the administrative staff that the report would only be sent to him and was told that it would, because he had paid. However, on October 12, 2022, Kaul received an email from PACE, which evidences the **"PACE Scheme"** intention to attempt to send it to the PA Medical Board, in clear contravention of their own TERMS AND CONDITIONS: **"Can you please provide me with a contact at the PA Board? I need this as soon**

as possible. Email and phone number would be great." Kaul responded with: "Please do not send the report to any person associated with the Pennsylvania Medical Board, until I have reviewed its contents.". It was the intention of Defendant PACE to place their knowingly fraudulent document before the PA Medical Board, in order to have the board not issue Kaul a license, and to manufacture a qualified immunity defense, knowing that Kaul would sue. On page 4/5 of the Root Cause Analysis, there exists evidence of Defendant PACE's criminal state-of-mind, in that in response to the question of: "What will you do in the future to prevent this from happening again", Kaul responded with: "I do not believe that considering my prosecution of K11-7, the Defendants, nor any other parties, will ever re-commit the crimes identified within the case, nor re-violate my human and constitutional rights … It was my decision to stay and fight, that will ensure such appalling events never happen again to me and my family, and hopefully such conduct will never be levied on any other physician." (EXHIBIT 4). Defendant PACE and K11-7 Defendant, Federation State Medical Boards, whom Defendant PACE had informed of Kaul's course participation, recognized Kaul's leverage with K11-7, a recognition that caused the K11-7 Defendants to exert pressure on U.S.D.J. Oetken to dismiss, on September 12, 2022, K11-7 with prejudice, and enter an injunction preventing Kaul from bringing suit in the United States District Court. Defendant PACE and their lawyers reviewed U.S.D.J. Oetken's order, but not realizing Kaul was in possession of audio evidence of their fraud, did believe that Kaul would have no legal recourse when they released their knowingly fraudulent document, and thus in conjunction with the K11-7 September 12, 2022, order, Kaul would be eliminated. Kaul, however, submitted documents into K11-7, that rendered the September 12, 2022,

opinion/order null and void pursuant to the doctrine of 'Fraud on the Court'/Rule 60. On this, and other legal/factual bases, Kaul filed K11-10 in the U.S.D.C.-S.D.N.Y. on December 13, 2022, a case that incorporates the K11-7 evidence/facts/claims.

28. <u>May 4, 2022 – Virtual interview with Defendant PACE physician Dr. Kai Macdonald</u>:  A thirty minute (30) virtual interview was conducted, during which Kaul answered questions regarding digital content about his life. Kaul detected a certain adversarial/judgmental tone during the short interview.

29. <u>June 15, 2022 – Virtual interview with Defendant PACE physician Dr. Kai Macdonald</u>: A four (4) hour Zoom virtual interview was initiated/conducted/evidently recorded by Defendant PACE, an interview that Kaul similarly and independently recorded. During this interview, Dr. Macdonald submitted arguments/statements that mimicked defenses submitted by the K11-7 Defendants, and most notably in regard to the May 27, 2021, kidnapping of Kaul. On this specific point, Dr. Macdonald attempted to minimize the illegality of the event, by characterizing it, as the K11-7 Defendants did, as a legitimate arrest, when in fact the evidence proved it was not. Similarly, he characterized the K11-7 claims as unbelievable, to which Kaul responded that all legal cases **"come down to the evidence"** and that <u>**The Kaul Cases**</u> Defendants had spent vast sums of money since 2016 **"running away"** from the evidence, and that was because they are **"guilty"**. Kaul stated that their conduct was not that of an innocent party. Dr. Macdonald did not respond. Dr. Macdonald was patently attempting to make the case for the K11-7 Defendants, because Defendant PACE was in conspiracy with them.

30. <u>July 6, 2022 – Virtual interview with PACE physician Defendant Leung</u>: A ninety (90) minute recorded virtual interview was conducted, a link to which is provided in Kaul's October 19, 2022, letter to PACE director, Dr. David Bazzo (**EXHIBIT 5**). That link is:

https://soundcloud.com/discover/sets/picks-for-you::richard-kaul

The audio evidence conclusively proves the knowing fraudulence of the Defendants October 17, 2022, report.

31. <u>July 21-22, 2022 – On-site evaluations</u>: Kaul's clinical/cognitive skills were assessed at Defendant PACE's physical facility in San Diego. This was video recorded, and despite Kaul's repeated requests to be provided a copy of the paid property of his file, including these videos, this evidence has not been provided by Defendant PACE, because it knows that it constitutes further proof of their knowing fraudulence of the October 17, 2022, report.

32. <u>September 15 to October 12, 2022 – Email exchange between PACE and Kaul re: issuance of report</u>: On July 22, 2022, while Kaul was on-site at Defendant PACE, he enquired as to when he would receive the report, and was informed that it would be within eight (8) weeks. However, by September 15, 2022, he had not received the report, and thus sent an email: **"Do you know when PACE will issue its report?".** Kaul received no response, and so telephoned the office of Defendant PACE on or around September 22, 2022. He spoke with the case manager and individual responsible for drafting the report, who advised him that she had been out on **"sick leave"** for several weeks, and that no other staff

member wanted to work on drafting the report. This individual informed Kaul the report would be issued within a couple of weeks. On October 11, 2022, Kaul still not having received the report, sent another email: **"Could you please advise as to when PACE will issue its report"** to which, on October 12, 2022, the case manager responded: **"Can you please provide me with a contact at the PA Board? I need this as soon as possible. Email and phone number would be great."** Kaul responded: **"Please do not send the report to any person associated with the Pennsylvania Medical Board, until I have reviewed its contents."** The case manager did not respond. As stated above, it was the intention of Defendant PACE to violate their own contractual terms and send their knowingly fraudulent report to the PA Medical Board, in order to prevent Kaul from having the license issued and to fabricate a qualified immunity defense, knowing that Kaul would file suit. Defendant PACE's deceptive/contractually violative misconduct evidences a criminal state-of-mind, in that it was using the US wires to transmit a knowingly fraudulent legal instrument in furtherance of its knowingly illegal **"PACE Scheme"**, i.e., the aiding/abetting of the K11-7 Defendants, Kaul elimination purposed **"pattern of racketeering"**.

33. October 17, 2022 – Email from Kaul to Defendant PACE re: request for case file: On October 17, 2022, Defendant PACE used the US wires to transmit/email its knowingly fraudulent report to Kaul, who readily established its falsity by cross referencing it to the June 15/July 6, 2022, audio files. Consequently, Kaul requested from Defendant PACE: **"Could you please forward me the complete file on which this report is based … including the video files."** Kaul received no response.

14

34. <u>October 19 to 27 2022 – Email exchange between Kaul and Defendant PACE re: falsity of report/request for case file</u>: Kaul requested Defendant PACE forward a letter (**EXHIBIT 5**) from Kaul to its director and report signatory, Dr. David Bazzo, and within the email re-requested a **"complete copy of my file with the PACE Program."** Within the email Kaul states: **"I find it immensely ironic and rather sad, that while I am criticized for prosecuting cases to vindicate my human rights and the multiple criminal violations against my property/person, agencies commercially associated with <u>The Kaul Cases</u> Defendants, as is PACE, continue to conspire to commit further violations."** Within the letter to Dr. David Bazzo, Kaul states, amongst other things: **"The report of Dr. Albert Leung is replete with knowing falsehoods, that render the entire PACE report either fraudulent or grossly negligent, but ultimately of no legal weight … except in the capacity of self-incriminating evidence … Kaul would like to provide you an opportunity to rectify the falsehoods propagated in this opinion, but do also provide you, via this letter, fair notice of litigation if my rights are not vindicated."** Defendant PACE uncharacteristically responded within less than four (4) hours, and the case manager, again uncharacteristically, copied the administrative director: **"Thank you for your email. As it our policy anytime someone challenges our report, we will be bringing your case back for review with our case conference committee. This will likely take place next Friday, October 28. I hope to have more updates for you soon."** The unusual rapidity of response, the multiple grammatical errors and the copying of the administrative director reflect Defendant PACE's state-of-mind re: legal liability and recognition of wrongdoing. Of note, Kaul's case manager knew that she, a signatory to the report, would not be in the office on

Friday October 28, 2022, and that there would be no meeting, as on October 27, 2022, Kaul sent her an email, and was informed by an automatically generated email that she would be back in the office on Monday 31 October 2022. Kaul's request for a copy of his file was once again ignored. On October 24, 2022, Kaul, not having received a copy of his file, emailed the case manager/administrative director: **"Please accept this email as a reminder to email me a copy of my entire case file with PACE, to include the three collateral interviews conducted by Dr. Macdonald of Drs. David Basch/Victor Katz/Merrill Stromer. These interviews contain, amongst other things, evidence relevant to the proof of the claims in The Kaul Cases, and most notably no mention was made of them in the initial October 17, 2022, report. These letters constitute further evidence of the guilt of The Kaul Cases Defendants."** Kaul received no response. On October 27, 2022, Kaul requested for the fourth (4th) time (October 17/19/24/27) a copy of his file. Kaul received no response, and Defendant PACE continues to withhold from Kaul the property of his file.

35. <u>October 31, 2022 – Email exchange between Kaul and case manager/administrative director re: evidentially truthful report and case file</u>: Kaul, having received neither the case nor an evidentially truthful report, emailed the case manager/administrative director: **"Could you please send me a copy of my file with the PACE Program, and advise me as to when I will receive the amended report as per the October 28, 2022 committee meeting."** The case manager's obfuscating response was: **"We have received your requests and will get back to you later this week. Thanks for your patience."** Defendant PACE's failure to send the file is consistent with the **"PACE Scheme"** intention to withhold

from Kaul evidence it knows would further prove the fraudulence of its October 17, 2022, report. Similarly, Defendant PACE's continued failure to send an evidentially truthful report is evidence of its recognition that the submission of such a report would be a tacit admission of its prior commission of fraud. Had there been no audio recording of the July 6, 2022, virtual interview with Defendant Leung, Defendants PACE/Leung would likely have 'gotten away with their crime' and caused Kaul's medical career/livelihood to cease. The ease with which the Defendants committed these offenses is consistent with-it being part of a long-standing **"pattern"**, of abusing the rights of physicians embroiled in regulatory scenarios. The majority of these physicians are either ethnic minorities or foreign medical graduates. This **"pattern"** of racial discrimination/targeting operates widely within the American physician regulatory/licensing apparatus. A similar case as to Kaul's is pending in the United States District of Colorado (Brizuela v CPEP: 22-CV-02737) which constitutes further evidence of a widespread, **"pattern"** within this industry, that of the **"Federation Cartel" ("FC")** (see below), in that it is a civil rights-based action regarding an ethnic minority physician (**EXHIBIT 10**). On November 10, 2022, Kaul submitted a FOIA to UC San Diego regarding the records of Defendant PACE, and on November 18, 2022, received confirmation of notice of request to UC San Diego.

36. November 4, 2022 – Email from Kaul to case manager re: letter to Dr. Bazzo: Kaul, not having received either an evidentially truthful report or his case file, emailed the case manager a letter (**EXHIBIT 6**) addressed to Dr. Bazzo, in which Kaul states, amongst other things: **"These facts, in conjunction with those stated in the October 19, 2022 letter, constitute serious violations of my**

17

human/constitutional rights, continue to exacerbate injury to my economic standing/reputation and represent a "pattern" of profit purposed misconduct that has undoubtedly injured other physicians ... Please be advised that if the amended report fails to reflect the evidence ... I will commence suit against all those involved in the "racketeering" conspiracy and the drafting of the fraudulent October 17, 2022, report." As of the filing date of this complaint, Defendant PACE has failed to send Kaul an evidentially truthful report and or the case file.

37. <u>November 9, 2022 – Email from Kaul to the administrative director re: evidentially truthful report and case file and reimbursement of fee</u>: Kaul, not having received an evidentially truthful report and or the case file, emailed the administrative director: **"Could you please provide the date as to when I will receive the amended report. However, if PACE has decided not to issue such a report, then I would ask that PACE refund the course fee."** Kaul received neither a response nor a refund.

38. <u>November 30, 2022 – Letter from Defendant PACE Director, Dr. David Bazzo to Kaul</u>: On December 1, 2022, Dr. David Bazzo, on behalf of Defendant PACE, emailed Kaul a letter (**EXHIBIT 7**) ostensibly in response to Kaul's November 4, 2022, letter. The letter appears to be written by a lawyer, and urges Kaul to destroy the audio evidence of Defendant PACE/Leung's fraud. Bazzo/lawyer fail to refute/contest/contradict the audio/documentary evidence that proves their guilt, but instead further propagates the fraud contained within their knowingly false October 17, 2022, report, but tellingly, with less specificity. For example,

they do not state: **"You claimed a stellate ganglion block could only be performed at the C7 vertebrae."** The procedure is most frequently performed at the C6 level, as this is the safest entry point, because the vertebral artery is exposed at C7, which is the level that Defendant Leung stated in his report, as the proper level. This is a basic fact of procedure, and Defendant Leung's ignorance of this point undermines Bazzo's conflicted glorification of Defendant Leung's expertise. Dr. Bazzo, incidentally, is a family practice physician, with no education/training/expertise in interventional pain, the area in which Defendant Leung purported to conduct a clinical interview. Defendant Leung's error in identifying C7 as the correct level re: performing the procedure was gross, as the C7 level is associated with markedly increased morbidity/mortality:

**"Nevertheless, SGB at C7 may be associated with more risk than SGB at C6. It may cause severe complications such as injury to the vertebral artery, inadvertent intra-arterial injection of local anesthetic, and pneumothorax [13-15]. If the vertebral artery is punctured inadvertently, it is impossible to stop bleeding by compression; consequently, surgery would be required. The accidental intra-arterial injection of local anesthetics may cause central nervous system toxicity, coma, and/or fulminant tonic clonic seizure. The vertebral artery arises from the subclavian artery, and then enters deep to the transverse process at the level of the C7 [16]. Furthermore, the thoracic cage is near, and the risk for pneumothorax is elevated."** Comparison of ultrasound-guided stellate ganglion block at 6th and 7th cervical vertebrae using the lateral para-carotid out-of-plane

19

approach for sympathetic blockade in the upper extremity - Yeungnam Univ J Med. 2018 Dec; 35(2): 199–204. Published online 2018 Dec 31. doi: 10.12701/yujm.2018.35.2.199

With regards to the level of the stellate ganglion, Defendant Leung states in his October 17, 2022, report: **"His knowledge of the neuronal markup, location, and innervation of stellate ganglion was inadequate as he incorrectly indicated the location of the ganglion is at the C6 tubercle instead of C7."** The stellate ganglion is indeed found at the C6 level, a fact that Defendant Leung must either have known if Bazzo's self-interested exaltations are to be believed, and if Dr. Leung knew, then he knowingly committed fraud; or alternatively Defendant Leung's medical knowledge is so woefully lacking that he should neither be practicing medicine, lecturing nor receiving money to evaluate other physicians, which logically renders Bazzo's opinion of Defendant Leung, as equally fraudulent. 'The blind leading the blind'. Kaul believes it is relevant for this Court to know that the oral examination section of all American and international board/fellowship exams are always conducted by at least two (2) examiners from the exact specialty of the examinee. This is the global standard, and one, quite clearly and knowingly violated by the Defendants and their co-conspirators.

Defendant PACE has chosen not to adhere to this standard, as 'cutting corners' reduces overheard, increases profit, and renders it near nigh impossible for a perceptibly 'tainted' physician to challenge that of a seemingly 'untainted' physician, and most definitely impossible if there is no audio evidence of the interaction.

Thus, Dr. Leung's report was either fraudulent and or grossly negligent, but regardless, he and Defendant PACE remain liable for damages to Kaul.

https://www.cedars-sinai.org/programs/pain-center/conditions/stellate-ganglion-blocks.html#:~:text=The%20stellate%20ganglion%20is%20a,supply%20the%20face%20and%20arm.

With regards to differential diagnosis, Bazzo/Lawyer state: **"... but that you also have tunnel vision when approaching pain in patient evaluations, which is inherently problematic and can result in missed and/or mis-diagnosis."** Bazzo/Lawyer failed to address/refute/contest the evidence Kaul submitted in his October 19, 2022, letter to Bazzo, in which he inserts the following quote from Wilson, MC (2012). *The Patient History: Evidence-Based Approach To Differential Diagnosis*. New York, NY: McGraw Hill:

**"Strategies used in preparing a differential diagnosis list vary with the experience of the healthcare provider. While novice providers may work systemically to assess all possible explanations for a patient's concerns, those with more experience often draw on clinical experience and pattern recognition to protect the patient from delays, risks, and cost of inefficient strategies or tests. Effective providers utilize an evidence-based approach, complementing their clinical experience with knowledge from clinical research."**

This is the standard of proper medical practice, in which an initial differential diagnosis is limited to the most likely causes. It is also the standard that if after proper investigation/treatment, these diagnoses do not result in a reduction of the patient's pain, then less likely diagnostic labels are added, and these are investigated/treated. It is poor practice to list too many differential at the initial

evaluation, as this leads to unnecessary and oftentimes risky investigations, that are associated with false positives and thus false/risky treatment plans. What Bazzo/Layer characterize as **"tunnel vision"** is the widely accepted standard of practice, as this has been proven to be the safest and most clinical efficacious approach. Bazzo's knowing misrepresentation of this standard and widely practiced approach as contributing to a **"Fail-Category 4"**, does in fact constitute evidence Defendants PACE/Leung guilt of the within charges, those of a knowing violation of Kaul's human/constitutional rights and his right not to be subjected to tortious interference of his property/liberty/life. Bazzo's November 30, 2022, letter is a blatant and illegal attempt to conceal their crimes, that include using the US wires in furtherance of a scheme. Defendants PACE/Leung commission of fraud/wire fraud and violation of Kaul's rights render null/void the 'hold harmless' document in their possession. Kaul did not agree to forego his right to sue for fraud/negligence, and or the transmission of a fraudulent/negligent legal instrument. A 'hold harmless' clause is inapplicable to cases in which there exists irrefutable evidence of fraud, as is the audio evidence, which was recorded with video within both the States of New Jersey and California, as per the consent: **"I understand that one or more of the standard testing modalities that I will participate in may be videotaped for documentation as part of the routine assessment protocol."** Defendant PACE continues to NOT provide Kaul with these videos, despite multiple requests.

39. December 6, 2022 – Letter from Kaul to Defendant PACE Director, Dr. David Bazzo: On December 6, 2022, Kaul emailed a letter, responding to the November 30, 2022, letter, in which he specifically refuted Bazzo's litigation-anticipating

claims regarding lack of consent/protected trade secrets/'hold harmless' (**EXHIBIT 11**). The Defendants attempt at preemptive legal defenses, evidences a guilty 'state-of-mind', as does their effort to have the audio evidence destroyed, and their continued failure to provide Kaul a copy of his case file and the within video recordings of both his off and on-site interviews.

## LEGAL CLAIMS

### Section 1983 – Deprivation of right under color of law
### Against Defendant UCSD PACE

40. Defendant UCSD PACE, operates under the authority and on license from the State of California, and accordingly issues its physician assessment reports on official UC San Diego School of Medicine letter-headed documents. It is a 'state actor' for the purposes of suit pursuant to Section 1983.

41. In a period commencing in or around late April/May 2022, Defendant PACE, having received approximately twenty-thousand dollars ($22,000) from Kaul for the assessment course, did, through online research, come to know that Kaul was prosecuting K11-7, a case in which one of the defendants was the Federation of State Medical Boards.

42. Communications were conducted between agents of Defendant PACE and agents of K11-7 Defendant, FSMB, as to Kaul and the consequences of various outcomes of the litigation.

43. In these communications, it was both understood and made explicit, that if Defendant PACE passed Kaul on the assessment course, he would be issued a license number by the State of Pennsylvania, which would bolster, through economic/reputational enhancement, his ability to both initiate and prosecute cases against the FSMB and those that had violated, and continued to violate, Kaul's right to his property/person/liberty.

24

44. Defendant PACE was motivated to participate in its knowingly illegal and unconstitutional **"PACE Scheme",** because the majority of its business is referred from the Federation and its approximately seventy (70) member state medical boards, the **"Federation Cartel" ("FC")**, as pled in K11-7.

45. Defendant PACE generated a record of these communications, and recognizing their proof of the **"PACE Scheme"**, did file them in a separate folder to that in which the facts of Kaul's assessment is contained.

46. At this point in time, Defendant PACE did not calculate nor indeed even anticipate, that Kaul has retained audio/documentary evidence of the fraudulence of their subsequent report, and so the Defendants, in conspiracy with K11-7 Defendant FSMB, proceeded with their **"PACE Scheme"** in full knowledge of its illegality.

47. In fact, Defendant PACE expected its scheme not to be exposed, because it had, since close to its inception, perpetrated such wrongs against many other physicians, none of whom obtained any evidence of its malfeasance, as no elements of the assessment were conducted virtually. Any challenges would be a 'he said, she said' scenario, in which Defendant PACE would extol the inscrutable virtues of their contracted physicians, in contrast to those tainted by the predatory tactics of the business of physician regulation, and profess their mission, in keeping with the 'party-line' of the **"FC"** of wanting to **"protect the public"**.

48. There exists no evidence that state medical boards protect the public, a fact to which these boards have admitted (Kaul v Federation: 19-CV-3050) (**EXHIBIT 8**). The sole purpose of the **"FC"** and its commercial partners, such as Defendant PACE, is to profit at the expense and through the exploitation of physicians, and particularly ethnic minority/foreign graduates, who also happen to be the majority of those injured by the predatory physician regulatory apparatus.

49. Defendant PACE recognized that its perpetration of the **"PACE Scheme"** was illegal and violative of Kaul's human/constitutional rights, as they knew that Kaul's recommencement of medicine directly depended on whether they passed or failed Kaul. The immense consequentiality and constitutional power of their report, as it pertained to the restoration of Kaul's right to his liberty/livelihood was a fact well known to Defendant PACE, and a fact they abused in pursuit of profit.

50. However, despite this knowledge, Defendant PACE remained complicit and conspired with K11-7 Defendant FSMB in the perpetration of their **"PACE Scheme"**, which included not just falsification of its October 17, 2022, report, but virtual interviews with Kaul, in which its agents advanced defenses submitted by the K11-7 Defendants. Defendant PACE appeared to be aiding and abetting the K11-7 Defendants, and in fact would have, to the fatal detriment of Kaul, aided and abetted the K11-7 Defendants, if Kaul had not procured irrefutable evidence of their fraud.

51. Kaul had paid for and was entitled to an assessment free of fraud and not a consequence of conspiracy or external influence, as Defendant PACE's assessment/report would have been the basis on which the Pennsylvania Medical Board would have issued a license.

52. Defendant PACE's attempt to send its knowingly fraudulent report directly to the Pennsylvania Medical Board, with the intent and knowledge of ending Kaul's career/right to a livelihood, constitutes a knowing deprivation of right perpetrated by a 'state actor', a deprivation which Kaul has, since at least 2012, been illegally subjected to in American administrative bodies/courts.

53. Evidence of these extreme deprivations, violative of international law/human rights, have been placed before an Indian court, as Kaul, a citizen of India, has thus far been foreclosed, for political/economic reasons, from even seeking, let alone procuring justice in America.

54. Defendant PACE, upon recognizing that Kaul had exposed the fraudulence of their report, then conducted multiple internal meetings and communications as to how to address the issue. These occurred via face-face meetings, telephone conversations and email.

55. Within the corpus of this evidence, exist communications that prove Defendant PACE concluded it could not amend its fraudulent report without it being a tacit admission of guilt. It also concluded that its only option would be to

ignore Kaul's requests for a copy of his file, a file Defendant PACE knows contains incriminating evidence, and to address litigation if and when filed by Kaul.

56. Defendant PACE, in adopting such a position, although cognizant of the fact of its **"pattern"** of having violated the human/constitutional rights of many other physicians, and the liability that would ensue from the exposition of this **"pattern"** if Kaul filed suit, concluded upon legal advice, that its only option was to not tacitly admit guilt by rendering an evidentially truthful report nor provide Kaul a copy of his file, but in fact to threaten Kaul if he did not destroy the audio evidence of June 15/July 6, 2022. This threat was delivered to Kaul via a letter he received on December 1, 2022, and not surprisingly, but still incredulously, Defendant PACE asserted the argument that their contractors could not possibly be guilty of fraud, because of their qualifications and because they contract regularly with Defendant PACE. The Catholic Church and its priests fiasco comes to mind, a case, interestingly, referenced by Dr. Macdonald during the June 15, 2022, interview.

## Tortious Interference/Commercial Disparagement
## Against Defendants UCSD PACE/Leung

57. Defendant PACE, an entity whose financial survival depends on the goodwill of K11-7 Defendant FSMB, a corporation with which it is commercially aligned, is thus a market competitor of Kaul, whose market elimination would serve the financial interests of Defendant PACE, K11-7 Defendant FSMB and **The Kaul Cases** Defendants.

28

58. This fact became known to Defendant PACE in or around May 2022, and caused it to devise its **"PACE Scheme"** to render a fraudulent report, in order to attempt to advance its commercial interests by eliminating Kaul. The fraudulent report was illegally transmitted to K11-7 Defendant FSMB, with the intention of causing it to be widely disseminated amongst counsel for **The Kaul Cases** Defendants and all state medical boards, as part of the **"PACE Scheme"** to eliminate Kaul.

59. Defendant Leung, an independent contractor, was motivated to conspire with Defendant PACE, in the commission of fraud, as he receives substantial monetary benefit from Defendant PACE, and did not anticipate that Kaul would procure audio evidence of his fraudulent contribution to the October 17, 2022, report.

60. The engineering of the **"PACE Scheme"** involved multiple internal/external communications, both digital/non-digital, between agents representing Defendant PACE and those associated with K11-7 Defendant FSMB.

61. These communications focused on what specific details would need to be included in the report to not only make it likely that the Pennsylvania Medical Board would not issue Kaul a license number, but to permanently prevent him from ever recommencing the practice of medicine, by fraudulently mischaracterizing his knowledge/clinical skills as representing a **"danger to the public"**. Defendant PACE's intent was malicious and designed to violate Kaul's rights of livelihood/liberty/life, i.e., to contribute to the massive violations

perpetrated against Kaul since 2005/2006 by **The Kaul Cases** Defendants and others.

62. Defendants PACE/Leung, along with other co-conspirators at Defendant PACE, knew that their statements regarding Kaul's knowledge/clinical skills were false, and that Kaul, as is clear from the audio/on-site clinical note and other patient/physician (**EXHIBIT 9**) testimonial evidence is highly knowledgeable and skillful. The Defendants, after having been provided the audio/on-site clinical note evidence, did not specifically or even generally refute that the evidence unequivocally proves the fraudulence of their October 17, 2022, report. Neither did they assert that their report truthfully reflected both the evidence of the virtual interviews and on-site interviews/examinations, but have, consistent with their guilty state-of-mind, refused to send Kaul a copy of the property of his file, inclusive of the on-site videos.

63. The audio recording, and Defendant PACE's report have been examined by other interventional pain physicians, all of whom concluded the report is a fraud, and that Kaul demonstrated a superior clinical knowledge.

64. The Defendants' report was transmitted to Kaul over the US wires, and constitutes an instrument purposed to suppress Kaul's right to a livelihood and cause tortious interference/commercial disparagement.

65. The Defendants wrongdoing has caused, and continues to cause immense injury to Kaul's economic standing/reputation/life, in that had the Defendants

report truthfully reflected the evidence, then Kaul would, by this point in time, have procured a licensing number, returned to his profession, and regained his livelihood, of which he has been illegally deprived since 2012.

66. Instead, the Defendants wrongdoing, which represents an extension of the knowing human/constitutional rights violations that commenced in at least 2012, and the report, so extreme in its falsity/language/mischaracterizations, has caused further malicious and unlawful harm to Kaul's professional career/livelihood/life.

67. Defendant PACE's attempt to send their report directly to the Pennsylvania Medical Board sought to prevent Kaul's hard-won grant of his application for licensure.

68. These facts of intent, knowledge, motive, fraudulent/wrongful interference, and actual harm substantiate the elements of claims for malicious tortious interference and commercial disparagement.

### Defamation and Defamation per se
### Against Defendants UCSD PACE/Leung

69. The Defendants defamation of Kaul's character and competence with the issuance and digital dissemination of a legal instrument with knowingly fraudulent and malicious statements, constitutes misconduct tantamount to a violation of Kaul's human/constitutional right to not be subjected to unlawful/false attacks on his reputation and honor. The Defendants misconduct constitutes a willful

perpetuation of a scheme of digital/legal defamation that commenced in 2012, that amounts to a criminal/constitutional violation, in that Kaul's livelihood/liberty are inextricably linked to his reputation.

70. The Defendants report, as the audio/clinical note evidence proves, is simply not an alternative opinion of the evidence, but a falsification not only of the audio/clinical note evidence, but also a knowing misrepresentation of established scientific/medical facts.

71. The Defendants October 17, 2022, report is submitted as a factual representation of the virtual interviews and in person evaluations, but the audio/clinical note evidence of its falsity is irrefutable, has not been refuted by the Defendants, and thus the Defendants are without either a truth or opinion defense. These fact are confirmed by Defendant PACE's December 1, 2022, letter, in which they neither refute the evidence nor raise any of these defenses (**EXHIBIT 7**).

72. The Defendants failure to avail themselves of the opportunity to submit an evidentially truthful report based on the 'hard' evidence, constitutes actual evidence of their criminal state-of-mind, lack of good faith and or reasonable belief, and is a tacit admission of their wrongdoing.

73. These conditions deprive the Defendants of raising any qualified immunity defense or of asserting a public interest argument, as they do with knowing falsity in their October 17, 2022, report. The fraudulence of the Defendants claim that

Kaul is a danger to the public because he allegedly lacks the relevant knowledge, is underscored by the audio/on-site clinical note/patient-physician testimonial evidence, and tacitly admitted by their refusal to provide him, despite his repeated requests, a copy of his case file, a file that contains, amongst other things, video evidence of Kaul's on-site evaluations.

74. The Defendants, as medical professionals, are knowledgeable as to the subject matter on which their report is based, and represent themselves as such, and thus cannot claim a belief in the honesty of their statements, as with for example, the level at which a stellate ganglion block is performed. It is indeed performed at the C6 level, in clear contradiction of Defendant Leung's knowingly false statement. The Defendants knew and know that their report is replete with falsehoods, which accounts for their refusal to submit a report based on the audio/clinical note evidence and or provide Kaul a copy of the property of his file.

75. The Defendants recognition of their defamatory statements caused them to attempt to have Kaul consent to permit them to email the report directly to a **"contact person"** at the Pennsylvania Medical Board, with the belief that if Kaul sued for defamation, they could raise a 'consent' and or qualified immunity defense.

76. This tactic evidences the Defendants prior history of litigation with wronged parties, as Kaul's contract as a self-referred party restricts the dissemination of the report to himself. However, despite this clause, the Defendants transmitted the report to K11-7 Defendant FSMB in furtherance of their conspiracy with **The Kaul Cases** Defendants to attempt to have Kaul eliminated.

77. The Defendants defamatory report constitutes a serious violation of Kaul's rights, in that it is continuing to prevent Kaul from securing a license/livelihood, which in conjunction with the Defendants refusal to reimburse Kaul the course fees and his decade-long state of poverty, are preventing him from securing an assessment with another program, thus causing a daily exacerbation of actual harm to Kaul.

78. This misconduct constitutes further evidence of the Defendants conspiracy with **The Kaul Cases** Defendants to attempt to eliminate Kaul, and the threat of future litigation associated with his ongoing existence.

## RELIEF

Kaul seeks compensatory/consequential/punitive damages for the ongoing injuries caused to his economic standing/professional career/reputation/liberty/life in the amount of one hundred and twenty-two million dollars ($122,000,000).


DATED: DECEMBER 6, 2022                    _____

                                          RICHARD ARJUN KAUL, MD

## RELIEF

Kaul seeks compensatory/consequential/punitive damages for the ongoing

injuries caused to his economic standing/professional

career/reputation/liberty/life in the amount of one hundred and twenty-two

million dollars ($122,000,000).


DATED: MAY 19, 2023

RICHARD ARJUN KAUL, MD